[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 130 
Appellant as complainant below filed its bill against appellee, a widow, as defendant below for the purpose of rescinding a real estate purchase made in December 1925 in the City of Miami by which bill it sought to reconvey the lot in question to defendant, to have cancelled a purchase-money mortgage and notes given by complainant in the amount of $120,000.00, and to recover $30,000.00 paid in cash to defendant by complainant as part of the purchase price. The bill prays that in default of such repayment, an accounting be had and complainant be decreed to have a lien upon said premises for the amount found to be due it upon such accounting and that such lien be foreclosed and a sale of said property be made to satisfy the said lien.
As grounds for such relief, the bill alleges that respondent misrepresented the dimensions of the lot in question to complainant as to depth and frontage, in that the receipt for the binder payment described the property as
 "Lot 2 Block 1 Rickmer's Subdivision of Dade County, Florida, located bet. 13th 14th Streets, N.E. being 52 2/10 ft. frontage on N.E. 2nd Ave. and running back 115 ft.;"
but that after the purchase and upon an engineer making measurements for the construction of a two story building thereon, it was found that the said lot fronted only 50.3 feet on N.E.2d Avenue and ran back less than 115 feet; that the Rand Building, constructed before the purchase, encroached upon the south side of said lot so that it covered *Page 131 
4.95 feet of the frontage by 46.65 feet back and that said Lot No. 2, extended back only 106.6 feet on the north border and about 102.95 feet on the south line. It is alleged that said representations were either falsely or recklessly made with disregard of the truth; that complainant relied upon said representations and thereby was induced to purchase said lot.
To this bill, defendant interposed a demurrer which was overruled. Thereupon an answer was filed denying any misrepresentations on the part of defendant and all allegations relied upon by complainant for relief; and later, pursuant to stipulations, defendant filed an amendment to her answer in which it appears she sought to have foreclosed the said mortgage held by her which in the meantime had become delinquent, both as to interest and part of principal.
Under these pleadings the cause was referred to a general master who after taking the testimony filed his report in which he made his findings that the allegations of the bill of complaint had not been substantiated by competent evidence and that the equities in the cause were with the defendant and against the complainant. The master's report also found in favor of the prayer of defendant for affirmative relief, and recommended that a decree be entered covering the principal and interest of the mortgage, together with attorney's fees and costs.
Upon the final hearing before the chancellor, a decree was entered finding the equities upon the original bill with the defendant and against complainant and dismissing the bill; but finding the amended answer insufficient upon which to base a final decree of foreclosure in behalf of defendant.
From the above decree appeal was duly entered, and appellant filed seven assignments of error; but in presenting *Page 132 
them in its brief, all errors were resolved into the statement that the court erred in finding the equities with the defendant and in dismissing the bill.
Appellee filed two cross-assignments of error based upon the court's order (1) in overruling defendant's demurrer, and (2) in dismissing the amendment to defendant's answer seeking affirmative relief.
Reverting first to the defendant's cross-assignments of error, it will be noted that the trial court denied the affirmative relief prayed for in the amended answer, because (1) said amendment contains no prayer for process against the plaintiff, (2) the mortgage sought to be foreclosed is not sufficiently set forth, (3) no process was issued directed to the complainant nor any decree pro confesso entered for failure of complainant to answer the cross-complaint of defendant, and because there was no cause at issue upon said cross-complaint.
We deem it unnecessary to enter into a discussion of those portions of the decree denying the affirmative relief, further than to state that it appears from a careful examination of all the questions presented that the trial court could scarcely have decreed otherwise; in fact a cross-bill or answer setting up affirmative relief by way of foreclosure, should set forth the cause of action with the same care and exactness that would be employed if the cross-bill or answer were the original bill. 3 Jones on Mortgages (8th Ed.) Sec. 1879. An examination of the amendment to the answer shows that it was not done in this case.
The other question presented by appellant's assignments of error may be briefly stated as follows: Was the complainant under the pleadings and proof entitled to a cancellation of its deed and the return of its cash payment? *Page 133 
It appears that the offer to buy the lots in question first came from L. J. Coyle, who represented himself and one Philip Hannick; that before the deed was delivered, Coyle and Hannick formed the Hancoy-Holding Company which took the deed and paid $30,000.00 cash and gave a mortgage for $120,000.00, as the purchase price; that defendant had not listed the property for sale with anyone; that Coyle's offer was communicated to Defendant in Atlanta by wire and she rejected the price offered, but offered to take $150,000.00, which he finally agreed to give. It further appears that the purchase was made and consummated in defendant's absence; that in drawing up the "deposit receipt," the property was described as "Lot 2, Block 1, Rickmer's Subdivision of Dade County," and that at the request of Coyle and by the use of the Plat Book of the City of Miami and a large map that hung on the wall, the dimensions of the lot were added at the time, as follows:
 "Located bet. 13th 14th Streets, N.E. being 52 2/10 ft. frontage on N.E. 2nd Av. and running back 115 feet."
An examination of the "Rickmer map," officially recorded in 1913 in Plat Book 3, page 2, as copied in the transcript, shows that the west side of "Biscayne Drive" (now known as N.E. Second Avenue) at the time of the survey, ran due north on the east side of lots 5, 4 and 3, and at the south line of lot 2, it turned toward the northeast in a straight line until it passed lots 2 and 1, thence straight north to Waddell street, and that according to this map, the depth of the south line of Lot 2 is 100 feet and the north line 115 feet. It appears from the transcript that about ten years after this map was filed and when the city was paving this street, the name of which appears to *Page 134 
have been changed from Biscayne Drive to N.E. Second Avenue, was straightened by changing the east front of the five lots referred to and also of a large lot just north of lots 2 and 1 to a straight front all the way from Rickmer Street on the south to Waddell Street on the north; said street then took a straight, but slightly northeasterly direction, the whole distance between Rickmer and Waddell streets. It appears to have been in the same condition at the time Mrs. Lambright purchased it, and also when she sold it to complainant about a year later.
According to the map of M. B. Garris, Engineer, filed in evidence, the depth of the lot on the north side was made about eight feet less by the change and the depth on the south side was increased about three feet. It is also apparent that the actual frontage on N.E. Second Avenue was decreased by at least two feet. The two maps evidenced in the transcript very clearly show that Lot No. 2, here in question, as well as all the adjoining lots, were each intended to be fifty feet in width from north to south, although they had a greater frontage than fifty feet on N.E. Second Avenue, which might be of advantage, depending to some extent as to whether the front of a building constructed thereon should square north and south or run diagonally northeasterly with the curb of the avenue. The evidence is uncontradicted that Coyle saw a map and plat of the property before the binder was paid, and that on at least three occasions he visited and inspected the property before closing the purchase by making the full cash payment, and accepting a warranty deed in which the property in question is described as"
 "Lot Two (2) Block One (1) Rickmer's Addition, according to the plat thereof as recorded in plat book 3 at page 2 in the office of the Clerk of the Circuit Court, in and for Dade County, Florida." *Page 135 
A title policy was issued in favor of complainant and a mortgage was made to defendant for the deferred purchase price in each of which the property is described substantially as given above.
Taking the main question presented by the case, it appears that the purchaser knew or should have known as much, or more, about the dimensions, location and border lines of the property than the owner or her alleged agent, Robinson.
The authorities are practically unanimous in holding that where the mistake complained of results from the want of that degree of care and diligence which would be exercised by persons of reasonable prudence under the same circumstances, equity will not relieve against it, and that a mistake such as will entitle one to cancellation must be material to the transaction and affect the substance thereof rather than being merely incidental thereto. See Langley v. Irons Land 
Development Co. 94 Fla. 1010, 114 So. 769; Thacker v. Newton,97 Fla. 444, 121 So. 470; Leathers Development Co. v. Orange Investment Co., 97 Fla. 278, 120 So. 329; 4 R.C.L. 506.
In the earlier case of Hirschman v. Hodges, O'Hara Russell Co., 59 Fla. 517, 51 So. 550, it is said:
 "A misrepresentation by a vendor to be a ground for a rescission of a contract must be in reference to some material thing unknown to the vendee, either from not having examined, or from want of opportunity to be informed, or from entire confidence reposed in the vendor. * * *
 "If after a representation of fact, however positive, the party to whom it was made institutes an inquiry for himself, and actually learns the real facts, he cannot claim to have relief upon the misrepresentation, and to have been misled by it. The same result must plainly *Page 136 
follow, when, after the representation, the party receiving it has given to him a sufficient opportunity of examining into the real facts when his attention is directed to the sources of information, and he commences or professes to commence an investigation."
Coyle testifies that the trade was under way from September to November 1925; that he did not have the property surveyed until February following; that he had seen the property two or three times before consummating the purchase and that he accepted a deed and a title insurance policy in both of which the property is described without specific dimensions; which would strongly favor the defendant's contention that Coyle bought mainly on his own knowledge and information. See 18 C.J. 285; 9 C.J. 226-227. It could hardly be maintained that this purchase should be rescinded because of any surprise, mistake, misrepresentation, want of freedom, undue influence, falsehood, or suppression of the truth. See Hirschman v. Hodges, O'Hara 
Russell Co., supra; Citizens State Bank v. Jones, ___ Fla. ___,131 So. 369.
In the concurring opinion of Mr. Justice Whitfield in the case of Hardee v. Horton, 90 Fla. 452, 497, 108 So. 189, 205, it is stated that
 "In construing a deed conveying lands and the maps referred to in describing the lands, the nature, origin, and purpose of the map, the position of the contracting parties and the circumstances under which they acted, should be considered, and the language used should be interpreted in the light of all the pertinent circumstances so as to give effect to the intent of the parties, even if an erroneous part of the description has to be disregarded in effectuating the general intent of the conveyance." See Campbell v. Carruth, 32 Fla. 264, 13 So. 432; Huffstetler v. Our Home Life Ins. Co., 67 Fla. 324, 65 So. 1; 4 R.C.L. 119 Sec. 58. *Page 137 
There is no evidence that defendant or her alleged agent pointed out any boundary lines to complainant, which is sometimes a determining factor. 2 Black on Rescission and Cancellation (2nd Ed.) Sec. 423. Jones v. Walter C. Hardesty Inc. (Fla.) 129 So. 497.
In making his survey for complainant, the engineer witness states that he started from monuments which were established some five years ago, because there was nothing "on the record plat to connect any tie-in to any section line," and that there was "no information on the record plat to define Biscayne Drive, or Northeast Second Avenue as it is now known." See 9 C.J. 180, Sec. 50. It is thus seen that any variance in the dimensions of Lot 2, Block 1, Rickmer Plat may have been caused by Garris' not following the official Rickmer Plat, as well as by the straightening of the Northeast Second Avenue. See Andreu v. Watkins, 26 Fla. 390, 7 So. 876. An official survey might show that the Rand Building does not encroach upon Lot 2.
The contention as to a shortage in frontage is also affected by the fact that there is nothing to show that the property was bought on, or at, a per-front-foot basis. The lot as a whole may have been benefited by the straightening of Northeast Second Avenue in front of this property from Rickmer Street to Waddell Street.
The contract of purchase involved in the case of Leathers Development Co. v. Orange Investment Co., provided for a lump sum of $103,125.00 for Lot 1 Block B of J. P. Hughey's Addition to Orlando, as recorded in plat book A, page 26, Public Records of Orange County, Florida; then follows the statement: "This 275 ft. frontage on Hughey Street, 116 feet deep." As in the present case, the bill was brought to rescind the purchase of the lot after the deed *Page 138 
had been delivered, cash payment made and mortgage given for remainder of the purchase price. It was there alleged that the amount of the purchase price was arrived at by figuring 275 feet frontage on Hughey Street at so much per front foot, when in truth and fact there was only 225 feet frontage on said street; but this Court said that the purchaser having been on the ground with every opportunity to inspect the property and to make actual measurements of the frontage of the property he contemplated purchasing, and having failed to do so and having closed the purchase, accepted a warranty deed describing the property without any reference to footage, paid the purchase price with cash and a purchase-price mortgage, and having been in possession for some time, could not later come into a court of equity seeking a rescission of the entire transaction because of a shortage which he had had every opportunity to learn all about before closing the purchase.
Complainant in the instant case also claims as an additional ground for rescission of the purchase that it was found that the Rand Building, which was constructed about a year before this sale was made, encroached upon the southern border of said property 4.95 feet front by 46.65 deep, and that defendant therefore had not delivered possession to that portion and declined to do so. In the case of Watkins et al. v. Emmerson,88 Fla. 86, 102 So. 10, it was held that "a deed by one to land which is in the adverse possession of another is void as against such adverse claimant." Farrington v. Greer, 94 Fla. 457, 113 So. 722; Gibbs v. McCoy, 70 Fla. 245, 70 So. 86; Gould v. Carr, 33 Fla. 523, 15 So. 259, 24 L. R. A. 130; Nelson v. Brush, 22 Fla. 374, Watrous v. Morrison, 33 Fla. 261, 14 So. 805, 39 Am. St. Rep. 139. A different rule applies in the case of mere encroachments or overlaps resulting from a mistake as to *Page 139 
a border line, especially where the contract is not "executory," but "executed" by delivery of a warranty deed. Musselwhite v. Oleson, 60 Fla. 342, 53 So. 944; Hunter v. Bradford, 3 Fla. 269. If there is no fraud in the transaction and the purchaser goes into possession, he cannot before eviction ask for and obtain the aid of a court of equity in order to have the contract rescinded, or the purchase money restored to him. In such cases, his remedy is at law upon the covenant of warranty in his deed. See B. F. Camp Lumber Co. vs. State Sav. Bank, 59 Fla. 455, 51 So. 543: Mickler v. Reddick,38 Fla. 341, 21 So. 286; Leathers Development Co. vs. Orange Inv. Co., supra; Maull v. Lindsey, 79 Fla. 361, 84 So. 92.
In the case of Gagnon v. Magic City Lumber Co., 98 Fla. 270,123 So. 757, this Court held that:
 "Where both pleadings and evidence were amply sufficient to sustain findings of general master and decree of chancellor, decree will be affirmed, in accordance with rule that, whether chancellor's decree be based on testimony taken before him or before master appointed by him, his conclusion on facts will not be disturbed, unless it clearly appears to be erroneous."
Finding no reversible error, the decree of the chancellor is affirmed.